## AS TO THE VALIDITY OF AN ISSUE OF MUNICIPAL BONDS.

Court of Appeals for Hamilton County.

THE CITY OF CINCINNATI, BY CHARLES A. GROOM, ITS SOLICITOR,
v. GEORGE PUCHTA, MAYOR, AND WILLIAM
LEIMANN, AUDITOR.*

Decided, April 24, 1916.

*Bonds—Validity of an Issue by a Municipality—Where Publication of
Notice of Election as to Authorization of Issue—Was Not Published
for the Full Statutory Period—Restriction on Amount of Issue—
Where the Authorization is by Majority Vote Only—Sections 3946
and 3952.*

1. Failure of election officials to publish, for the full thirty days re-
quired by law, notice that at an approaching election the question
of authorizing an issue of municipal bonds will be submitted, does
not render the election invalid as to said bonds, where the election
was held in other respects in accordance with law and there is
abundant evidence that knowledge of an intention to submit said
question was brought home to the great body of the electors.

2. Where a bond issue is authorized by a majority but not by a two-
thirds vote, Section 3952 limiting the issue to 2½ per cent. of the
total value of the city property as listed for taxation is applicable,
and the authorization is valid only within the limits of the 2½ per
cent. restriction.

*Chas. A. Groom,* City Solicitor, for plaintiff.

*Saul Zielonka,* Assistant City Solicitor, and *John E. Bruce,*
contra.

Appeal from the Court of Common Pleas of Hamilton County,
Ohio.

JONES (Oliver B.), J.

This is an action brought by the city of Cincinnati by its
city solicitor against the mayor and auditor of said city to en-

*Affirmed without opinion, *Cincinnati v. Puchta, Mayor,* 94 Ohio State,
—.

join the issue and sale of $250,000 bonds for parks, playgrounds, boulevards and parkway purposes.

The case was heard upon appeal on the petition, an amendment to the petition, the answer of defendants, and upon the evidence.

The board of park commissioners of the city of Cincinnati, on the 15th day of April, 1915, declared by resolution that it was necessary to issue, for the purpose of carrying into effect the powers conferred upon it by law, $1,250,000 of bonds of the city of Cincinnati, and transmitted said resolution to the city council. More than ninety days elapsed after said resolution was received by it without the council having passed the necessary legislation for the issuance of such bonds.

On the 19th day of August, 1915, the board of park commissioners filed a resolution and request with the board of deputy state supervisors and inspectors of elections of Hamilton county, Ohio, requesting said board to submit the question of the issuance of such bonds to the qualified electors of the city of Cincinnati in the manner provided by law for voting on such questions, at the next general election to be held on the 2d day of November, 1915.

Said board of deputy state supervisors and inspectors of elections caused the following notice:

"ELECTION NOTICE.—Notice is hereby given to the qualified electors of the city of Cincinnati that at the general election to be held in said city on Tuesday, the second day of November, 1915, the question of issuing bonds, by resolution of the board of park commissioners, will be submitted as follows:

"'Shall the city of Cincinnati issue bonds in the sum of $1,250,000 for parks, playgrounds, boulevards and parkways?'"

to be published in the Cincinnati daily *Times-Star*, a newspaper printed in that city, once a week for four consecutive weeks prior to said election, said publication commencing on the 7th day of October, 1915.

The election was so held on November 2, 1915. The total number of registered electors entitled to vote at such election

was 101,163; the total number of electors voting at said election was 96,282; and the total number of votes cast for and against the issuing of said park bonds was 81,064. Forty-seven thousand two hundred and ninety-four electors voted for, and 33,770 voted against the issue of said park bonds, the majority in favor of such issue being 13,524 votes.

It appears from the evidence that in addition to the legal notice published in the Cincinnati daily *Times-Star* above referred to, much notoriety was given to the fact that the question of voting upon the issue of park bonds would be submitted at the general election to be held November 2, 1915, by numerous publications in all of the newspapers of the city and by many public meetings at which the subject was presented by different speakers, and that the public generally were fully informed upon the fact that such special election on this question would be held.

In accordance with said proceedings and election, on November 23, 1915, the council of the city of Cincinnati duly passed an ordinance providing for the issue of bonds of said city in the sum of $1,250,000 for park purposes, which ordinance was duly approved by the mayor and published according to law.

On December 3, 1915, the city auditor, in accordance with law, offered said park bonds to the trustees of the sinking fund of the city of Cincinnati, and said sinking fund trustees then accepted $250,000 of said issue of bonds and rejected the remaining $1,000,000 of said bonds. Said latter amount of bonds were then offered in accordance with law to the board of commissioners of the sinking fund of the school district of the city of Cincinnati, and afterwards to the industrial commission of Ohio, both of which bodies rejected the said bonds. Thereupon the city auditor duly advertised the sale of $250,000 of said bonds according to law. Bids were received for same March 22, 1916, and an award was made to the highest bidders for the sum of $268,175. This action was then brought to prevent the consummation of the sale under said award.

On the same day bids were received by the city auditor for the sale of $200,000 bonds of the city of Cincinnati to be issued

under an ordinance of council passed January 18, 1916, to provide funds to pay the costs and expense of improving and repairing streets, viaducts, bridges and culverts in said city. The original issue provided by said ordinance was $280,000, of which $80,000 was taken by the sinking fund commission on February 3, 1916.

A statement of the bonds already issued by the city and, its net indebtedness thereunder was furnished in evidence, as was also a statement of the total value of all the property of such city as listed and assessed for taxation, from which statements it is agreed that if both sets of bonds are issued under the awards made by the city auditor on March 22, 1916, as above recited, the net indebtedness of the city, including such bonds, would then be in excess of two and one-half per cent. of the total value of its property, but not in excess of five per cent. of such value as provided in Sections 3941, 3948 and 3952, General Code.

The questions submitted for decision are:

1. Does the failure to advertise the legal notice of the special election strictly in compliance with General Code 3946 invalidate that election and the bond issue made thereunder.

2. Where the city council fails to issue bonds in accordance with the request of the board of park commissioners, and an election is had thereon by virtue of Section 4064, General Code, does a majority vote in favor of the bonds obviate the restrictions imposed by Sections 3941 and 3952, General Code? In other words, is the limitation of a bond issue authorized by a majority vote in such an election two and one-half per cent., or is it subject only to the limitation of five per cent. under the terms of Sections 3948 and 3952, General Code?

3. If such issue is in excess of the limitation allowed should the court enjoin the entire sale, or only so much of said bonds as would make the net indebtedness exceed the limitation imposed by law?

The requirements of Section 3946, General Code, in a municipality where a newspaper is printed, are that thirty days' notice

of an election for the issue of bonds shall be given in one or more newspapers, once a week for four consecutive weeks prior to such election. In this case the legal notice published by the board of deputy state supervisors and inspectors of elections was printed in a newspaper once a week for four consecutive weeks, but the first publication was only twenty-six days prior to the election instead of thirty days as required by law.

The purpose of such a provision of law is to fully advise the electorate of the submission of the proposition to be voted on, that a full expression may be had of the will of the people upon that question. So far as the duty of the election board is concerned, all of the details of the law should be strictly observed, and as to them the provisions found in 3946, General Code, must be considered mandatory; but where the objects to be accomplished have been fully met, and general notice of such approaching election has been had by the electors, and a full vote has been cast thereon evidencing such knowledge, the failure of the election officers to comply fully with the requirements of law must be deemed, so far as the election itself is concerned, an irregularity which will not invalidate it.

In this case it was shown that each elector was given a ballot upon the question of issuing these bonds, and considering the well known tendency of many voters to ignore questions of this character and to fail to vote thereon either at general or special elections, a large vote was cast upon the question, compared with the total vote. This in itself shows that the electorate were well informed as to the fact of such special election, and were not in any way prejudiced by the misfeasance of the election officers in publishing the legal notice for a period of twenty-six days instead of for the full period of thirty days. The election, therefore, must be held valid.

In *Foster* v. *Scarff*, 15 O. S., 532, the court says at page 537:

"We have no doubt that where an election is held in other respects as prescribed by law, and notice in fact of the election is brought home to the great body of the electors, though derived through means other than the proclamation which the law prescribes, such election would be valid."

To the same effect are: *In re Chagrin Falls*, 91 O. S., 308, 312; *Fike* v. *State of Ohio*, 4 C.C.(N.S.), 81; *Harpster* v. *Brower*, 5 C. C., 395; *McCrary on Elections*, 4th Ed., Section 179; *Town of Grove* v. *Haskell*, 24 Okla., 707; *Ardmore* v. *State*, 24 Okla., 862.

2. The question of whether a favorable majority vote on the issue of park bonds provided for under Section 4064 and 4065, General Code, is still subject to the limitation found in Sections 3941, 3948 and 3952, General Code, has been disposed of by the case of *Henderson* v. *Cincinnati*, 81 O. S., 27. At the time of the decision of that case Section 3952 had not been enacted, and the limitation of four per cent. found in Section 3941 was held applicable to an issue of park bonds authorized as was the issue under consideration here. Section 3952 reduces that limit of four per cent. to two and one-half per cent. and under the decision of the Supreme Court referred to such limitation would undoubtedly apply here, where, as in this case, the bond issue carried by a majority vote and not by a vote of two-thirds.

3. The question of the legality of any issue of bonds under the proceedings had, has also been discussed by counsel. It is conceded that, so far as the $250,000 of park bonds taken by the board of sinking fund commissioners is concerned, they are within the limitation of two and one-half per cent., and they are, therefore, valid bonds. It is questioned whether there was authority in the board of park commissioners to request, and the city officers to order, the issue of less than the full amount of park bonds authorized which had not been taken by the sinking fund commissioners, viz., $1,000,000. While no positive provision is made in the ordinance authorizing the sale of these park bonds, for selling them at different times in different parcels, it would seem the common-sense view to take of the matter that it was not intended by council that in the absence of immediate need of the full value of $1,000,000 the park board would not have authority to sell an issue of less than that amount sufficient for their needs from time to time. In the opinion of this court, there is no objection to the fact that but $250,000 were advertised and sold in the award under question here. But, as

held by the Supreme Court in the Henderson case, there is nothing in the park bond law that dispenses with the general limitation imposed by Sections 3941, 3948 and 3952, General Code, and as the favorable vote for the issue of these bonds was not the two-thirds vote provided for in Section 3947, General Code, the limitation applicable here must be two and one-half per cent. rather than five per cent. of the total value of the city property. Up to the extent, therefore, of two and one-half per cent., the issue of these bonds would be legal.

The determination of just what sum can be issued is further involved by the fact of the attempted sale of street repairing bonds at the same time. It appears that the ordinance for the issue of the park bonds was prior in time to the ordinance for the issue of street repairing bonds, and because of that fact it would appear to be entitled to precedence. But Section 3950, General Code, fixes the time when an indebtedness shall be deemed created or incurred, and the determination of which indebtedness is first incurred is left to the decision of the proper officers of the city as a matter of official action, rather than to the determination of this court upon such presentation as here made, it being understood, however, that no bonds can be issued in excess of the total limitation imposed by law.

A decree may be drawn enjoining the issue and sale of any bonds in excess of the amount fixed by such limitation, which doubtless can be agreed upon by counsel.

JONES (E. H.), P. J., and GORMAN, J., concur.